## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| LINDA CRAWFORD, | ) | |
|     Plaintiff, | ) | |
|  | ) | |
|     v. | ) | C.A. No. 1:23-CV-00380-MSM-PAS |
|  | ) | |
| SALVE REGINA UNIVERSITY (SRU), | ) | |
| SALVE REGINA UNIVERSITY | ) | |
| BOARD OF TRUSTEES through its | ) | |
| President DR. KELLIE J. | ) | |
| ARMSTRONG; JAMES G. | ) | |
| MITCHELL, Chair SRU Department | ) | |
| of Modern Languages and President, | ) | |
| Salve Regina AAUP Chp.; ESTHER | ) | |
| ALARCON-ARANA, Faculty, SRU | ) | |
| Dept. of Modern Languages; and | ) | |
| EMILY COLBERT-CAIRNS, Faculty, | ) | |
| SRU Dept. of Modern Languages, | ) | |
|     Defendants. | ) | |

### MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

Before the Court is a Motion to Dismiss all counts of plaintiff Linda Crawford's Complaint (ECF No. 11), brought by defendants Salve Regina University ("the University"); the University's Board of Trustees through its President, Dr. Kellie J. Armstrong; and James G. Mitchell, Esther Alarcon-Arana, and Emily Colbert-Cairns, the plaintiff's former colleagues in the University's Modern Languages Department. The plaintiff alleges breach of contract, various torts, and violations of state and federal anti-discrimination law related to the University's termination of her employment as a tenured professor.

The plaintiff originally filed her complaint in Rhode Island Superior Court. (ECF No. 1-1.) The defendants removed the case on the basis of federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1441, and 1446. (ECF No. 1.) The plaintiff objects to defendants' Motion to Dismiss and further argues that because defendants appended purportedly extraneous factual material as exhibits, it should be converted to a motion for summary judgment per Fed. R. Civ. P. 12(d). (ECF No. 16.)

For the following reasons, the defendants' motion is GRANTED as to all the plaintiff's federal and state anti-discrimination claims (Counts V-IX). Absent federal court jurisdiction over any of the surviving claims, and because this case remains in its early stages, this Court declines to exercise supplemental jurisdiction over the plaintiff's remaining state-law contract and tort claims.

## I.    BACKGROUND

As required on a motion to dismiss, the Court must accept the Complaint's well-pled facts as true and discard its conclusory assertions and legal conclusions. *A.G. ex rel. Maddox v. Elsevier, Inc.*, 732 F.3d 77, 80 (1st Cir. 2013).

At the time of her termination in January 2022, the plaintiff was a tenured professor of Spanish in the University's Modern Languages Department, a position she had held since 2004. (ECF No. 1-1 ¶ 15.) The plaintiff "maintained a positive record of employment" as a professor, with her "evaluations over the last several years" showing "no negative trends in her performance or deviations [from] her adherence to her teaching responsibilities." *Id.* ¶ 16. Moreover, her employment

record "is devoid of contemporaneous[ly] documented misconduct of any kind." *Id.* ¶18.

Unfortunately, however, the plaintiff was mired in various workplace conflicts. She alleges a "protracted history of disagreements" with her department chairperson, James G. Mitchell, against whom she had previously filed a grievance. *Id.* ¶ 39. Letters to the University from her Modern Languages colleagues Esther Alarcon-Arana and Emily Colbert-Cairns provide additional, vivid evidence of the tension within the department; per the Complaint, her fellow faculty members inveighed that plaintiff's "focus was to undermine the modern languages department," that she "bad[-]mouthed male colleagues," that she made transphobic, homophobic, antisemitic, and xenophobic comments, that she was a "parasite" and a "toxic person," and that she "'sewed acrimony' among students, faculty, and staff." *Id.* ¶¶ 112-13. A faculty committee hearing board opinion affirming the plaintiff's termination similarly cited "[i]ssues in the modern language[s] department" that had "been long[-]standing" and had gone "largely ignored by previous administration[s] and human resources." *Id.* ¶ 65.

In the plaintiff's telling, this intradepartmental ill-feeling came to a head in the Fall 2021 semester and led to her termination. The plaintiff alleges that, at the beginning of the semester, Mitchell and an unnamed University provost directed the plaintiff's undergraduate students to "keep a running list of criticisms" of the plaintiff. *Id.* ¶ 70. Then, in a November 2021 meeting of the plaintiff's course on Latin American Culture, a student identified as "Student D" "had an outburst in

class." *Id.* ¶ 27.  Student D was "upset because Plaintiff, who he described as a 'cis White woman,' used a reading that contained the word 'trans[vestites].'"[1]  *Id.*

After that class, Student D and others met with Mitchell in his office, at Mitchell's invitation.  *Id.* ¶ 37.  During that meeting, Michell "encouraged and/or directed the students to submit written statements to the university criticizing" the plaintiff, purportedly in "an effort to retaliate against" her.  *Id.* ¶¶ 39-40.

The next day, Student D emailed a University provost, asking the administration to "take action" against the plaintiff, who he described as "ignorant." *Id.* ¶¶ 29, 33.  According to the Complaint, Student D's email recounted "that he [had] informed" the plaintiff that, because plaintiff "is a white straight cis woman, … she cannot tell [him] what" he, as "a transgender gay man," "find[s] offensive.'"  *Id.* ¶ 31.  Student D stated that Mitchell had advised him to submit "a formal complaint" about the plaintiff's actions.  *Id.* ¶ 29.

Another student, "Student C," wrote, "that he was 'directed by an advisor,'" who the plaintiff identifies as Mitchell, to email the provost about "derogatory language regarding transgender people in Plaintiff's class."  *Id.* ¶ 34.  Student C reported that he "found the language at issue to be 'triggering'" and opined that "the classroom should be a 'warm and safe space.'"  *Id.*

---

[1] While the Complaint states that Student D objected to Crawford's use of a reading that included the term "transgender," this appears to be a typographical error.  A preceding paragraph implies that the disputed term was "transvestites."  (ECF No. 1-1 ¶ 24.)  Moreover, in an email written by Student D about plaintiff, he described himself as a "transgender gay man."  *Id.* ¶ 31.

The plaintiff cites the student complaints' similar "tone and content" as "indicating that they were the product of a deliberately coordinated effort." *Id.* ¶ 42. She also characterizes "certain students" as "[taking] the position that [she] had no right to teach about certain cultural norms in Latin America because she was [a] 'cis white woman.'" *Id.* ¶ 71.

The University later held a Zoom meeting, without the plaintiff, for the plaintiff's students. *Id.* ¶ 43. Reportedly, certain students "described Plaintiff as using 'offensive language and hateful rhetoric' towards the L[GB]QT+ community and people of color." *Id.* ¶ 44. The plaintiff claims that she was not given an opportunity to contest these claims before her termination. *Id.*

Approximately a week after that class, the University's Title IX coordinator emailed plaintiff a "Notice of Interim Action." *Id.* ¶¶ 47-48. He stated that students "alleged that the Plaintiff made comments that were derogatory toward 'a population based on that population['s] ... gender identity or expression'" and that students who were members of the "Spanish Club" "expressed that they 'do not feel safe around'" the plaintiff. *Id.* ¶ 48. The coordinator stated, however, that the email should "not be construed to indicate that the university has taken any disciplinary [action] against" her. *Id.*

On January 3, 2022, the University notified the plaintiff that she had been terminated for cause, citing "continued misconduct," "failure to communicate," and "failure to comply with the requirements of a faculty member in accordance with the Faculty Manual." *Id.* ¶ 17. Per the plaintiff, the University's President described the

November 2021 class as the "catalyst" for plaintiff's termination but claimed that the "past seven years" of her employment had been "'fraught' with misconduct in the classroom and unacceptable teaching practices." *Id.* ¶ 23. The plaintiff alleges that, after her termination, the University "replaced [her] with respect to at least part of her teaching schedule with a male significantly younger than [her] who is believed to be the husband of Defendant Alarcon-Arana." *Id.* ¶ 73.

The plaintiff "was the first and only tenured full professor subject to termination proceedings" at the University. *Id.* ¶ 79. She asserts that other faculty members were "treated with far greater deference … in the face of more serious accusations," invoking an unnamed "male administrator of the Modern Languages Department [who] was involved in a concerning legal matter" but was "allowed … to 'step down' from his position and [was] awarded … full tenure, two sabbaticals and several course reductions." *Id.* ¶ 78. The minority opinion of the faculty committee hearing board that reviewed her dismissal appears to reference the same individual, stating that "one of [the plaintiff's] colleagues … continues in their position even though some years ago, this person could have justifiably been 'fired for cause' on grounds that were publicly known" in "newspaper stories and police reports." (ECF No. 11-8 at 12.)

The plaintiff appealed her termination to the University's faculty committee hearing board. (ECF No. 1-1 ¶ 54.) As discussed further below, the Court reads the hearing board's report, including the majority and minority opinions, as though it was incorporated into the Complaint. *See Foley v. Wells Fargo Bank, N.A.*, 772 F.3d

63, 74 (1st Cir. 2014) (noting that, on a Rule 12(b)(6) motion, courts may consider certain documents not attached to the complaint falling into one or more identified "narrow exceptions" (quoting *Watterson v. Page*, 978 F.2d 1, 3 (1st Cir. 1993))).  The hearing board voted three to two to affirm the plaintiff's termination.  (ECF No. 11-8 at 3.)

At the review hearing, the bases presented by the University to support the plaintiff's dismissal were misconduct ("including sexual harassment"), abandonment, incompetence, and "[f]ailure to meet or comply with the terms and conditions of her employment."  *Id.* at 2.

The majority opinion found that the University had presented sufficient evidence that the plaintiff "regularly and routinely uses derogatory language that minimizes others and promotes hurtful stereotypes" and "shows regular patterns of abandonment in her teaching or interaction with students."  *Id.* at 5.  It rejected the claim that she "operated to undermine her colleagues' academic credentials" while previously serving as department chair as insufficiently substantiated, as well as "hearsay" allegations that the plaintiff "engages in conversations with students about the ethnicity or religious beliefs of her colleagues."  *Id.*

The majority also expressed its belief that the plaintiff's termination "was based on evidence that … was collected prejudicially."  *Id.*  It cited the "addition of two more reasons for dismissal" by the University after plaintiff had already been terminated, testimony that "was not solicited in an independent way," and the inclusion of sexual harassment as a reason for dismissal when it was "unclear"

whether a Title IX investigation was ever conducted. *Id.* at 6. It opined that this "bias in the evidence collection process does not appear to be a complete function of prejudice against the [plaintiff,]" but "rather … a product of an ill-conceived dismissal procedure that is greatly out of date with current practices." *Id.* at 5.

Like the majority, the minority opinion described the plaintiff's termination process as "prejudicial." *Id.* at 8. It posited that evidence was collected from a biased sample of students and colleagues, that student feedback and other objective performance measures were cherrypicked to support dismissal, that the class discussion incident was unfairly "characterized as a one-way, unilateral failure on the part of the professor, with no critical exploration of student reactions to" the controversial article, which it described as "eminently 'teachable,'" and that the university did not substantively respond to evidence presented by the plaintiff that "undercuts the legitimacy of their charges." *Id.* at 9-11. It characterized the administration's approach to the termination process as: "we need to dismiss [plaintiff]; these are the categories available to us to do so; let us try to wedge [plaintiff's] problems into these categories as best we can." *Id.* at 9.

The minority opinion opined that the plaintiff's termination was, in actuality, motivated by the University's belief that "number and scope of 'unworkable' relationships" between the plaintiff "and others in the community" had become "so problematic" that her "continued presence" had "reach[ed] a generally dysfunctional status." *Id.* at 8. The opinion described the plaintiff as having "had a pattern of relationship problems over the years with every level of the university—with some

students, the majority of her faculty colleagues in the Modern Languages department, and the entirety of the present undergraduate academic affairs administration (from Undergraduate Dean to Provost to President)." *Id.* That the plaintiff was "continually in the middle" of "wide-ranging tension, even conflict, with various members of the Salve community" was not, in its view, "by itself an indication of fault on her part in every instance," but still "pose[d] a problem for the institution." *Id.* It submitted, however, that dismissal was the "wrong tool for solving the problem" of the "difficult and complex personnel issue" posed by the plaintiff, and that "[o]ther remedies, more creative and constructive, should be explored" instead. *Id.* at 12.

The plaintiff appealed the hearing board's decision to the University's Board of Trustees, which affirmed her dismissal. (ECF No. 1-1 ¶¶ 82-83.) She then filed this action in Rhode Island Superior Court.

Additionally, to support her age discrimination claim, the plaintiff asserts that unidentified individuals referred to her and another senior faculty member "as 'old school' because of their request that students use their titles and not their first names"; told a student "that she may want a different advisor … who was capable of 'fresh ideas and perspectives'"; and "criticized" her "for not using gender neutral endings in Spanish and told [her that] this was because she was 'older.'" *Id.* ¶ 74.

## II.    MOTION TO DISMISS STANDARD

"The sole inquiry under Rule 12(b)(6) is whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiffs, the complaint states

a claim for which relief can be granted." *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7 (1st Cir. 2011).

The Court must "accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor." *A.G. ex rel. Maddox*, 732 F.3d at 80. It "may augment these facts and inferences with data points gleaned from documents incorporated by reference into the complaint." *Id.* (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011)). It need not credit the complaint's "conclusory statements" and allegations that, "though disguised as factual, are so threadbare that they omit any meaningful factual content." *Id.* at 81.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "If the factual allegations in a complaint, stripped of conclusory legal allegations, raise no 'more than a sheer possibility that a defendant has acted unlawfully,' the complaint should be dismissed." *Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 270 (1st Cir. 2022) (quoting *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013)). "[A]ssessing plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *Rodríguez-Reyes*, 711 F.3d at 53).

## III.    DISCUSSION

### A.  Conversion under Fed. R. Civ. P. 12(d)

The defendants' Motion to Dismiss includes ten exhibits.  (ECF Nos. 11-1 through 11-10.)  The plaintiff argues that, under Fed. R. Civ. P. 12(d), the Court must either exclude the materials in question or convert the motion to dismiss to a motion for summary judgment.

Rule 12(d) provides that "[i]f, on a motion under Rule 12(b)(6) … matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).  "[N]o conversion occurs," however, where a district court, in its discretion, "chooses to ignore the supplementary materials and determines the motion under the Rule 12(b)(6) standard." *Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, F.S.B.*, 958 F.2d 15, 18 (1st Cir. 1992).  Furthermore, district courts may consider, without converting a Rule 12(b)(6) motion into one for summary judgment, "documents that were not attached to the complaint" falling into certain "narrow exceptions," including "documents the authenticity of which are not disputed by the parties; … documents central to [plaintiff's] claim; or … documents sufficiently referred to in the complaint." *Foley*, 772 F.3d at 74 (quoting *Watterson*, 987 F.2d at 3).

The Court limits its consideration of the Motion to Dismiss exhibits to the faculty manual excerpts and faculty committee hearing board report, including the majority and minority opinions.  (ECF Nos. 11-1, 11-8.)  The Court may do so because the plaintiff does not dispute the authenticity of these two documents; indeed, she

concedes that they are "arguably incorporated into the Complaint." (ECF No. 16-1 at 19.) *See Foley*, 772 F.3d at 74. The hearing board report is also "sufficiently referred to in the complaint" to be cognizable on a Rule 12(b)(6) motion. *Id.* The Complaint quotes the minority and majority opinions, the latter at some length, to support the plaintiff's disparate treatment claim. (ECF No. 1-1 ¶¶ 65-66, 69.)

The Court is also satisfied that the plaintiff had actual notice of the contents of both documents. *See Watterson*, 987 F.2d at 4 ("The problem that arises when a court reviews statements extraneous to a complaint generally is the lack of notice to the plaintiff"; "[w]here plaintiff has actual notice" of their contents, the "necessity" to convert the motion "is largely dissipated." (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992)) (brackets omitted)).

## B. Anti-Discrimination Claims

The plaintiff's anti-discrimination claims are brought pursuant to five statutes: the Rhode Island Civil Rights Act ("RICRA"), R.I.G.L. § 42-112-1 *et seq.* (Count V); the Rhode Island Fair Employment Practices Act ("FEPA"), R.I.G.L. § 28-5-1 *et seq.* (Count VI); Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000 *et seq.* (Count VII); Title IX of the Education Amendments of 1972 ("Title IX"), § 20 U.S.C. 1681 *et seq.* (Count VIII); and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* (Count IX).

The plaintiff asserts that the University and Board of Trustees (the institutional defendants) discriminated against her on the bases of her gender

(Counts V, VI, VII, and VIII); race and color (Counts V, VI, and VII); sexual orientation (Counts V, VI, and VII); age (Counts V, VI, and IX); and religion (Counts V and VI).

### 1. Discriminatory terms of employment

The plaintiff alleges that the institutional defendants subjected her to discriminatory terms of employment based on her gender, race, sexual orientation, age, and religion in violation of RICRA, FEPA, Title VII, Title IX, and the ADEA.

Each statute approaches disparate treatment claims that are based on circumstantial evidence, such as those in this case, using the familiar Title VII *McDonnell Douglas Corp. v. Green* burden-shifting analysis. 411 U.S. 792 (1973); *see also DeCamp v. Dollar Tree Stores, Inc.*, 875 A.2d 13, 21-22 (R.I. 2005) (RICRA and FEPA); *Ing v. Tufts Univ.*, 81 F.4th 77, 82 (1st Cir. 2023) (Title IX); *Vélez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 446-47 (1st Cir. 2009) (ADEA).

A prima facie case "presents a four-part test: (1) the plaintiff must be a member of a protected class; (2) she must be qualified for her job; (3) she must suffer an adverse employment action at the hands of her employer; and (4) there must be some evidence of a causal connection between her membership in a protected class and the adverse employment action." *Bhatti v. Trs. of Boston Univ.*, 659 F.3d 64, 70 (1st Cir. 2011).

The prima facie elements form "part of the background against which a plausibility determination should be made," and "may be used as a prism to shed light upon the plausibility of a claim." *Rodríguez-Reyes*, 711 F.3d at 54. But the "prima

facie standard is an evidentiary standard, not a pleading" one.  *Id.*  The dispositive test is not whether the plaintiff has presented the elements of a prima facie case, but whether the complaint "contain[s] facts that 'plausibly allege' that the plaintiff experienced a discriminatory employment action."  *Frith*, 38 F.4th at 271 (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)).

The plaintiff has adequately alleged that she is a member of all submitted protected classes, that she was qualified for her job, and that she suffered an adverse employment action in the form of her termination.  She fails, however, to plausibly allege that her protected characteristics had any "causal connection" to her dismissal. *Bhatti*, 659 F.3d at 70.  She has thus failed to state a claim of disparate treatment.

The plaintiff asserts but fails to provide well-pled facts to plausibly allege that others outside of her protected class(es) were given preferential treatment by the University.  A causal connection between a plaintiff's protected characteristics and an adverse employment action may be supported by evidence that similarly situated individuals outside the plaintiff's protected class were treated more favorably.  *See, e.g.*, *Diaz v. City of Somerville*, 59 F.4th 24, 32 (1st Cir. 2023).

The plaintiff alleges that she is the only tenured full professor to have been formally terminated, and that a male administrator in her department was not subject to such proceedings despite having been "involved in a concerning legal matter."  (ECF No. 1-1 ¶¶ 78-79.)  The faculty committee hearing board minority opinion similarly invokes "one of [the plaintiff's] colleagues" who "could have

14

justifiably been 'fired for cause' on grounds that were publicly known (newspaper stories and police reports)."  (ECF No. 11-8 at 12.)

"[W]hile the plaintiff's case and the comparison cases that [she] advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances." *Diaz*, 59 F.4th at 32 (quoting *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir. 1999)).  Here, one obviously relevant circumstance would be the nature of the "concerning legal matter," which the Court cannot divine from innuendo.  The plaintiff's and hearing board's allusions are too vague to allow for a reasonable inference that the unnamed faculty member is a similarly situated comparator.

Next, that a significantly younger male of unspecified race and sexual orientation replaced the plaintiff with respect to at least part of her courseload may be relevant to a prima facie case under *McDonnell Douglas*. *See, e.g.*, *Cham v. Station Operators, Inc.*, 685 F.3d 87, 93 (1st Cir. 2012) (noting that one way to meet the fourth element of a prima facie case is to show that the position "was filled by a person with similar qualifications" (quoting *Kosereis v. Rhode Island*, 311 F.3d 207, 212-13 (1st Cir. 2003))).  *But see LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 846 (1st Cir. 1993) ("[A] discharged employee 'is not replaced'" for purposes of a prima facie case "when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1457 (6th Cir. 1990))).

When considering whether the plaintiff has stated a plausible claim of disparate treatment, however, her replacement with a younger male does little to support a reasonable inference that her protected characteristics played a role in her termination. *See Reilly v. Cox Enters., Inc.*, C.A. No. 13-785S, 2014 WL 4473772, at *8 (D.R.I. Apr. 16, 2014) (finding that plaintiff's having been "replaced by a younger man" was "insufficient to support a plausible inference of age or gender discrimination") (citing *Han v. Univ. of Dayton*, 541 F.App'x 622, 627 (6th Cir. 2013)), *adopted*, No. 13-785S, by Order of July 30, 2014.

The plaintiff's proffered evidence of protected class-based animus is similarly unhelpful. The comments excerpted from her colleagues' letters to the University, describing the plaintiff as a "parasite," a "toxic person," and "sew[ing] acrimony," while likely offensive and unpleasant, are neutral as to all submitted protected characteristics. (ECF No. 1-1 ¶¶ 112-113.) *Cf. Morales-Cruz*, 676 F.3d at 225 ("unflattering" but "gender-neutral" descriptions of the plaintiff as "fragile" and "immature" did not support an inference of gender stereotyping). Rather, other than her age-discrimination claim, the plaintiff appears to put all her eggs in one basket: Student D's describing plaintiff as a "white straight cis woman" and a "cis White woman."

The value of Student D's two statements to the plaintiff's disparate treatment claim is limited by his status as a "nondecisionmaker" and by the fact that his statements, despite referencing the plaintiff's race, gender, and sexual orientation, appear to be facially inoffensive "stray remarks." *See Gonzalez v. El Dia, Inc.*, 304

F.3d 63, 69 (1st Cir. 2002) ("'[S]tray workplace remarks,' as well as statements made ... by nondecisionmakers ... normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus.").

More critically, "assessing plausibility is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Frith*, 38 F.4th at 275 (quoting *Rodríguez-Reyes*, 711 F.3d at 53). Even in the elliptical form in which they are presented in the Complaint,[2] common sense leads the Court to read Student D's statements describing the plaintiff as a straight, white, cisgender woman as part of his explanation, first to the plaintiff and then to the provost, of why he was offended by the plaintiff's use of the term "trans[vestite]" and by her purported attempt to "tell [him] what" he, as "a transgender gay man," should "find offensive.'" (ECF No. 1-1 ¶¶ 27, 31.) The Court need not infer invidious discrimination when faced with an "obvious alternative explanation" for the conduct at issue. *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567); *see also Frith*, 38 F.4th at 275 (relying on "[c]ommon sense" explanation of employer's allegedly discriminatory action to affirm dismissal).

The plaintiff's characterization of "certain students" as "[taking] the position that [she] had no right to teach about certain cultural norms in Latin America

---

[2] The relevant allegations are as follows:

"During the class in question," Student D "appeared to become upset because Plaintiff, who he described as a 'cis White woman,' used a reading that contained the word 'trans[vestite].'" (ECF No. 1-1 ¶ 27.)

"[Student D] states that he informed the Plaintiff that he was a 'transgender gay man' and she [Plaintiff] is a white straight cis woman, so she cannot tell me [Student D] what I [Student D] find offensive." *Id.* ¶ 31.

because she [is] [a] 'cis white woman'" (ECF No. 1-1 ¶ 71), appears to be an unsupported, subjective interpretation of the students' statements, which the Court need not credit, rather than a well-pled factual allegation, which the Court would accept.  The Court need not credit a complaint's "unsupportable conclusions," *In re Ames*, 993 F.3d 27, 35 n.3 (1st Cir. 2021) (quoting *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996)), nor "speculation, unaccompanied by any factual predicate," which cannot "confer plausibility" on a complaint.  *Morales-Cruz*, 676 F.3d at 225.

As for the comments relied on to support plaintiff's age-based disparate treatment claim, the plaintiff provides no information about the speakers or when the comments were made.  (ECF No. 1-1 ¶ 74.)  These unmoored statements cannot support a reasonable inference between any potential age-based animus and the plaintiff's termination.

The submitted procedural irregularities in the University's dismissal process similarly fail to "'nudge[] [plaintiff's] claims' of invidious discrimination 'across the line from conceivable to plausible.'"  *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570).  In the context of student discipline, the First Circuit has noted that "procedural irregularities" in due process procedures "may be relevant in identifying" discrimination.  *Doe v. Stonehill Coll., Inc.*, 55 F.4th 302, 334 (1st Cir. 2022).  But "procedural errors are not inevitably a sign of [protected class-based] bias" or that the plaintiff has stated a plausible claim of discrimination.  *Id.*  On a motion to dismiss a claim of disparate treatment founded on procedural-irregularity evidence, "[t]he challenge is to distinguish between proceedings plausibly affected by [illegal] bias"

18

and "proceedings whose alleged flaws are not attributable to sex bias," but "other plausible reasons" such as "ineptitude, inexperience," and even "bias" that is nevertheless "[protected class]-neutral." *Id.* (quoting *Doe v. Samford Univ.*, 29 F.4th 675, 692 (11th Cir. 2022)).

Many of the identified faults in the plaintiff's termination process do not contribute to an inference that her termination was procedurally irregular or otherwise involved a discriminatory motive. Many of the University's actions are either not alleged to have violated an internal rule or the faculty manual (ECF No. 1-1 ¶¶ 20, 43, 44, 48, 54, 62) or are presented as part of a broader argument that the faculty manual's termination procedures are unfair even when followed faithfully. *Id.* ¶¶ 50, 52, 53, 57-59, 61, 63, 64. The Court can also disregard violations of the University's procedures alleged by the plaintiff but contradicted by the faculty manual's text. *Id.* ¶¶ 55, 80; ECF No. 11-1 at 28 (in the event of an appeal, faculty member is suspended without pay from the date of the termination notification), 27-32 (dismissal for cause process does not include a requirement for mediation).

The weightier alleged procedural violations, laid out more cogently in the hearing board's opinions than in the Complaint, cast doubt on how the evidence against plaintiff was collected, whether it was given disproportionate weight by the University, and whether the University administration acted pretextually to get rid of a faculty member at the center of multiple contentious relationships. But, as explained below, the identified procedural issues do not, in the context of this case, render the plaintiff's disparate treatment claim plausible.

19

In *Stonehill College*, the First Circuit reviewed the defendant college's successful motion to dismiss a student plaintiff's claims, which centered on a procedurally defective expulsion hearing. *Stonehill Coll.*, 55 F.4th at 315-16. The Circuit reversed the district court's dismissal of the plaintiff's breach of contract claim. *Id.* at 329-30. It affirmed, however, the district court's dismissal of the plaintiff's Title IX discrimination claim, reasoning that, while "the facts as alleged may plausibly suggest undue solicitude" to the female complainant, the plaintiff had not plausibly alleged that the University's biased treatment of the two parties was "attributable to sex rather than to some other reason, such as [the female student's] status as a complainant." *Id.* at 334-35.

The refrain of the Complaint and the minority hearing board opinion is that the plaintiff's termination was motivated by interpersonal conflicts. Like the plaintiff in *Stonehill*, this plaintiff has presented no facts plausibly linking that web of tense relationships, or the purportedly biased investigation, to her protected characteristics. Bias unconnected to any protected characteristic, not cognizable as a disparate treatment claim, presents the "obvious alternative explanation" for the alleged procedural irregularities. *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567).

"We cannot infer ... discrimination based on factual allegations that are 'just as much in line with' the non-discriminatory explanation [that the Court has] identified." *Frith*, 38 F.4th at 276 (quoting *Ocasio-Hernández*, 640 F.3d at 9). "As between [this] 'obvious alternative explanation[]' for" the purportedly problematic

20

termination process "and the 'purposeful, invidious discrimination [that the plaintiff] asks us to infer, discrimination is not a plausible conclusion.'" *Air Sunshine, Inc. v. Carl*, 663 F.3d 27, 37 (1st Cir. 2011) (quoting *Iqbal*, 556 U.S. at 682).

Moreover, when distinguished from the plaintiff and hearing board's objections to the termination procedures as written and even when followed, the submitted violations of the University's internal processes do not appear "so egregious" as to support, in and of themselves, an inference that the University was motivated by the plaintiff's protected characteristics. *Stonehill Coll.*, 55 F.4th at 335.

Taking all the plaintiff's factual allegations holistically and construing all inferences in her favor does not yield a plausible claim that her membership in any of the submitted protected classes played a role in her termination. She has failed to state a claim of disparate treatment.

### 2. Hostile work environment

The plaintiff also alleges that defendants subjected her to an unlawful hostile work environment related to her gender, race, sexual orientation, age, and religion in violation of RICRA, FEPA, Title VII, and the ADEA. Each of these statutes applies the same standard. *See DeCamp*, 875 A.2d at 21-23 (RICRA and FEPA); *Franchina v. City of Providence*, 881 F.3d 32, 45 (1st Cir. 2018) (Title VII); *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 91 (1st Cir. 2018) (ADEA).

A plaintiff must show that "(1) she is a member of a protected class; (2) she was subject to harassment; (3) the harassment was based on her membership in a protected class; (4) the harassment was sufficiently severe or pervasive so as to alter

the conditions of her employment and create an abusive work environment; (5) the harassment was both objectively and subjectively offensive; and (6) there exists some basis for employer liability" to support a hostile work environment claim  *Flood v. Bank of Am. Corp.*, 780 F.3d 1, 10 (1st Cir. 2015).  The facts presented by plaintiff do not permit a reasonable inference that she experienced either severe or pervasive harassment based on her membership in a protected class.  *Cf. Flowers v. FLLAC Educ. Collaborative*, No. 18-1170, 2019 WL 10982432, at *2 (1st Cir. 2019) (affirming dismissal of hostile work environment claim for failing to plausibly allege the fourth and fifth elements of a prima facie case) (unpublished).

With a less threadbare showing of discriminatory animus, the plaintiff's colleagues' alleged behavior might serve as "atmospheric incidents relevant to her hostile work environment claim."  *Flood*, 780 F.3d at 12; *see also Marrero v. Goya of Puerto Rico, Inc.*, 304 F.3d 7, 28 (1st Cir. 2002) ("[A]n act of harassment that is not actionable in and of itself may form part of a hostile work environment claim.").  But the sum of relevant factual allegations potentially speaking to animus—Student D's remarks, detailed above, and the various comments by unspecified speakers presented in support of her age-based claim—do not allow the Court to connect the dots between the plaintiff's protected characteristics and the Complaint's reported intradepartmental machinations and backbiting.

Nor do the totality of alleged incidents plausibly suggest the severe or pervasive harassment required to sustain a hostile work environment claim. "[W]hether the environment is objectively 'hostile or abusive' must be answered with

reference to 'all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Marrero*, 304 F.3d at 18-19 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).  That question is nevertheless "[s]ubject to some policing at the outer bounds," as here.  *Id.* (quoting *Gorski v. N.H. Dep't of Corr.*, 290 F.3d 466, 474 (1st Cir. 2002)).   While harassment may be either severe *or* pervasive, it "[n]evertheless…must pass a *certain* threshold of severity.  Offhand comments and a tense or uncomfortable working relationship with one's supervisor are, without more, insufficient to support a hostile work environment claim." *Flood*, 780 F.3d at 12 (emphasis added).  Taken together, the plaintiff's well-pled facts do not plausibly meet that threshold.   She has thus failed to state a claim of a hostile work environment.

### 3. Retaliation

Finally, the plaintiff asserts that the institutional defendants retaliated against her in violation of Title VII and Title IX.  The elements of a prima facie case of retaliation under these statutes are identical.  *Ing*, 81 F.4th at 84.  The plaintiff must "prove that (1) she engaged in protected conduct under Title VII [or Title IX]; (2) she suffered an adverse employment action; and (3) the adverse action was

causally connected to the protected activity." *Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009) (quoting *Marrero*, 304 F.3d at 22).

An employee has engaged in protected conduct "if she has either (1) opposed any practice made an unlawful employment practice by Title VII [or Title IX] or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" the relevant statute. *Fantini*, 557 F.3d at 32 (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996)) (internal quotation marks omitted). When the alleged protected conduct involves "oppo[sing]" an "unlawful employment practice," a plaintiff must have "a good faith, reasonable belief that the underlying challenged actions of the employer violated" Title VII or Title IX. *Id.* (quoting *Wimmer v. Suffolk Co. Police Dep't*, 176 F.3d 125, 134 (2d Cir. 1999)).

The Complaint does not allege that the plaintiff engaged in any protected conduct. The plaintiff states that she was "retaliated against because she sought to teach in an environment of free speech and academic freedom"; this factually threadbare statement points to no employment practice that the plaintiff could have reasonably believed violated either anti-discrimination statute. (ECF No. 1-1 ¶ 81.) The Court is similarly unable to discern the nature of the plaintiff's long-standing disagreements with or grievance against Mitchell and cannot reasonably infer that this history involved protected conduct. The plaintiff has thus failed to state a claim of retaliation.

## C. Remaining State-Law Claims

Having dismissed all the plaintiff's federal and state anti-discrimination claims, the Court declines to exercise supplemental jurisdiction over the remaining state-law claims in contract and tort.

"In a federal-question case, the termination of the foundational federal claim does not divest the district court of power to exercise supplemental jurisdiction but, rather, sets the stage for an exercise of the court's informed discretion." *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 256-57 (1st Cir. 1996); *see* 28 U.S.C. § 1367(c)(3) (allowing a district court to decline adjudication of remaining state-law claims after "all claims over which it has original jurisdiction" have been dismissed).

"In deciding whether or not to retain jurisdiction on such an occasion, the trial court must take into account concerns of comity, judicial economy, convenience, fairness, and the like." *Roche*, 81 F.3d at 257 (citing *Rodriguez v. Doral Mortg. Corp.*, 57 F.3d 1168, 1177 (1st Cir. 1995)). "The preferred approach is pragmatic and case-specific." *Id.*

The circumstances support remanding the action to state court. The action is in its earliest stages, before discovery has begun and before any significant motions, other than the motion to dismiss, have been filed. Accordingly, the Court declines to exercise supplemental jurisdiction over the remaining state-law claims and remands them to the state court where the plaintiff originally chose to bring them.

## IV.    CONCLUSION

The defendants' Motion to Dismiss (ECF No. 11) is GRANTED as to the plaintiff's state and federal anti-discrimination claims (Counts V-IX). The Court declines to exercise supplemental jurisdiction over the plaintiff's remaining state-law claims and REMANDS them to the Rhode Island Superior Court sitting in Newport, for the county of Newport.

IT IS SO ORDERED.

_____
Mary S. McElroy
United States District Judge

June 18, 2024